IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-219-BO-RJ

| | | |
|---|---|---|
| MONICA FAITH USSERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| LORRIN FREEMAN, in her individual and | ) | |
| official capacity as Wake County District | ) | |
| Attorney; HONORABLE ERIK A. HOOKS, | ) | |
| in his individual and official capacity as | ) | |
| Secretary of the North Carolina Department | ) | |
| of Public Safety; CASSANDRA | ) | |
| DECK-BROWN, in her individual and | ) | |
| official capacity as Chief of the City of | ) | |
| Raleigh Police Department; DEDRIC | ) | |
| BOND, in his individual and official | ) | |
| capacity as City of Raleigh Police | ) | |
| Department Captain; ROGER "CHIP" | ) | |
| HAWLEY, in his individual and official | ) | |
| capacity as Chief of North Carolina State | ) | |
| Capitol Police; MARTIN BROCK, in his | ) | |
| individual and official capacity as Chief of | ) | |
| the North Carolina General Assembly | ) | |
| Police Department; DERICK PROCTOR, in | ) | |
| his individual and official capacity as an | ) | |
| officer of North Carolina State Capitol | ) | |
| Police; TITO FINK, in his individual and | ) | |
| official capacity as an officer with the North | ) | |
| Carolina State Capitol Police; and The City | ) | |
| of Raleigh, City of Raleigh Police | ) | |
| Department Officers John and Jane Does | ) | |
| 1-4, | ) | |
| | ) | |
| Defendants. | ) | |

This cause comes before the Court on four motions to dismiss plaintiff's second amended

complaint filed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

The appropriate responses and replies have been filed, or the time for doing so has expired, and in this posture each motion is ripe for ruling. For the reasons explained more fully below, the motions to dismiss are granted and plaintiff's second amended complaint is dismissed.

BACKGROUND

Plaintiff (Ussery or plaintiff) initiated this action by filing a complaint alleging claims against defendants arising from her arrest and prosecution following her protest against restrictions imposed by the governor of North Carolina during the COVID-19 pandemic. In her second amended complaint, [DE 50] (SAC), plaintiff alleges that all defendants engaged in a conspiracy to deprive her of her constitutional rights provided by the North Carolina Constitution (Count I) and for violation of her rights under Article I, Sections 12, 14, and 19 of the North Carolina Constitution (Count VI). She further alleges the following claims brought pursuant to 42 U.S.C. § 1983 for violation of her rights provided by the United States Constitution: a § 1983 conspiracy by all defendants (Count I), violation of her First Amendment rights by all defendants (Count II), violation of her procedural due process rights under the Fourteenth Amendment by all defendants (Count III), violation of her procedural due process rights under the Fourteenth Amendment for *Brady* violations against defendant Freeman (Count IV), and violation of her equal protection rights under the Fourteenth Amendment against all defendants (Count V). Ussery seeks a declaration that defendants violated her First and Fourteenth Amendment rights under the United States and North Carolina Constitutions as well as compensatory and nominal damages and attorney fees.

The relevant factual allegations supporting plaintiff's claims are as follows. On 14 March 2020, the Governor of North Carolina, Roy Cooper, issued Executive Order No. 117 to address concerns arising from the emerging COVID-19 pandemic. Executive Order No. 117 prohibited,

2

among other things, mass gatherings of more than 100 people but provided for continued normal operation of medical facilities, libraries, shopping malls, and transportation centers. SAC ¶ 25. On 17 March 2020, Governor Cooper issued Executive Order No. 118, again in response to the emerging COVID-19 pandemic, which closed all bars in North Carolina and restricted restaurants to dine-out services only. SAC ¶ 26. On 23 March 2020, Governor Cooper issued Executive Order No. 120, which closed businesses such as gyms, movie theaters, and hair salons. SAC ¶ 27. On 22 March 2020, Wake County issued a Proclamation of Emergency Restrictions (Wake County Proclamation) which restricted gatherings of fifty or more people. SAC ¶ 88; [DE 50-12]. On 27 March 2020, Governor Cooper issued Executive Order No. 121 (EO 121) which required North Carolinians to stay at home unless performing essential activities, including travel for health and safety reasons, to obtain needed supplies, or to engage in essential business and operations. SAC ¶ 28; [DE 50-1]. EO 121 also limited confined indoor and outdoor gatherings to ten persons or fewer. *Id.*

Both EO 121 and the Wake County Proclamation recognized that just days earlier the World Health Organization had declared COVID-19 a global pandemic and the President of the United States had declared that the COVID-19 pandemic constituted a national emergency [DE 50-12; DE 50-1]. EO 121 and the Wake County Proclamation were issued to help slow the transmission of the COVID-19 virus in order to keep the maximum number of people well and enable essential services such as the provision of healthcare to continue. *Id.* EO 121 expressly provided that its terms would be enforced by state and local law enforcement. [DE 50-1 § 5]. EO 121 became effective on 30 March 2020 at 5:00 p.m. and was limited to thirty days' duration unless repealed, rescinded, or replaced. *Id.* § 7.

3

A Facebook group called ReOpenNC was created in response to Governor Cooper's COVID-19 executive orders. SAC ¶ 29. ReOpenNC organized a protest of the executive orders to take place on 14 April 2020 at the state government complex in downtown Raleigh. *Id.* ReOpenNC protestors were told to meet for the protest in a state visitor parking lot on Wilmington Street known as Lot 1. *Id.* Lot 1 is an uncovered, outdoor parking lot. SAC ¶ 30. Ussery attended the 14 April 2020 protest along with her stepson. SAC ¶ 31. Ussery's stepson drove to the protest with Ussery and they spent most of the protest at their car, as did other protestors. *Id.* At 12:14 p.m., the Raleigh Police Department posted a message to its Twitter account that it was aware of the ReOpenNC protest and was "monitoring the situation." SAC ¶ 34.

That afternoon, members of the Raleigh Police Department (RPD) and the State Capitol Police (SCP) arrived near the corner of Lot 1. Defendant Bond, a captain with the RPD, informed the protestors that they could not gather where they were gathered, that they were in violation of Governor Cooper's executive order, and that the gathering was a public health violation. Defendant Bond requested that the protestors disburse. SAC ¶ 35. Defendant Bond asked the protestors to leave the sidewalk and the parking lot and informed the protestors that if they did not comply they could be arrested. *Id.* Ussery alleges that, in response to EO 121 and Wake County's Proclamation, the City of Raleigh created a policy that the act of protesting was a non-essential activity and that protesters were subject to arrest and prosecution under N.C. Gen. Stat. § 14-288.20(2).[1] SAC ¶ 88. Ussery alleges that the existence of the City of Raleigh's policy is evidenced by a post to the RPD Twitter account on 14 April 2020 stating that "Protesting is a non-essential activity", as well as subsequent statements by city officials and defendant Freeman. *Id.*; SAC ¶ 37; [DE 50-5].

---

[1] The likely reference was to N.C. Gen. Stat. § 14-288.20A(2).

Following Captain Bond's instructions to disperse, some cars began to leave Lot 1, and Ussery told her stepson to leave; Ussery walked out of Lot 1 so that she could take pictures of the cars as they drove away. SAC ¶ 40. Ussery then realized that she had the keys to the car and her stepson could not leave. *Id.* Ussery returned to Lot 1 and, concerned for her stepson's safety, got the attention of a police officer speaking to her stepson while waving the car keys. Ussery received a signal from the officer which amounted to what she believed was permission to reenter Lot 1 to give the keys to her stepson. *Id.* Ussery gave her stepson the car keys and instructed him to leave while she intended to walk around the government complex. SAC ¶ 41.

Ussery, "standing by herself in full compliance with all social distancing mandates of the governor's executive order without anyone near her except for police officers[,]" was then told by a police officer to leave Lot 1. *Id.* Ussery replied that she could not leave because the car she had arrived in had left. *Id.* Ussery was arrested by RPD officers and walked to the corner of Lot 1 where transport vans were located. *Id.* Ussery was transported to the Wake County Detention Center by defendants Proctor and Fink, both officers with the SCP; Proctor drove, Ussery was placed in the front passenger seat, and Fink sat in the backseat. SAC ¶ 42. Proctor's incident report reflected that Fink was wearing a body camera and recording during transport. *Id.*; [DE 50-2].

Ussery was processed at the Wake County Detention Center and defendant Proctor presented probable cause to a Wake County magistrate that Ussery had violated EO 121, in violation of N.C. Gen. Stat. § 14-288.20(2), which is a Class 2 misdemeanor. SAC ¶ 43. Ussery was detained for approximately one hour, released, and ordered to appear on 25 June 2020 at Wake County District Court. SAC ¶ 44.

Following Ussery's arrest, members of the legislature, the press, and others made inquiries to the governor's office regarding the impact of EO 121 on the right to peacefully protest. SAC ¶¶

5

45-51; [DE 50-4; 50-6]. In response, Governor Cooper stated that EO 121 did "not interfere with people's constitutional rights to express themselves" but did prohibit "unlawful mass gatherings." SAC ¶ 47. Defendant Lorrin Freeman, the Wake County District Attorney, commented that the RPD's reading of EO 121 was "technically correct" and that protesters had been "told that if they spread out they could stay[.]" *Id.* On 18 April 2020, counsel for Ussery sent a letter to Governor Cooper and Greg Ford, Chairman of the Wake County Board of Commissioners, seeking clarification of EO 121 and the Wake County Proclamation as well as dismissal of the charges against Ussery. SAC ¶ 49; [DE 50-6]. Governor Cooper's office responded by letter on 20 April 2020, stating that outdoor protests had not been prohibited by EO 121 and that they may proceed so long as they complied with social distancing requirements laid out in EO 121. SAC ¶ 50; [DE 50-7].

ReOpenNC held a second protest on 21 April 2020 with approximately 300 people in attendance. Defendant Freeman stated during an interview that day that she had talked with law enforcement about how to respond to ReOpenNC's 21 April protest and that she was reviewing the footage of ReOpenNC's prior protest as well as the charges against Ussery. SAC ¶ 51. No ReOpenNC protestors were arrested on 21 April 2020, despite the fact that there were more protestors than had been present on 14 April 2020 and the 21 April protestors were in closer contact. SAC ¶ 52. Various other protests took place in Raleigh in the months following EO 121, with Governor Cooper walking with Black Lives Matter protestors on 1 June 2020. SAC ¶ 54. Peaceful protestors were not arrested for trespass or violating any executive orders during May and June 2020 protests, and, though more than 160 people were arrested during Black Lives Matter protests, most of those arrests were for misdemeanors such as failure to disburse and in many cases the charges were dropped. SAC ¶¶ 174-175.

6

On 25 June 2020, Ussery was arraigned in Wake County District Court and entered a plea of not guilty. SAC ¶¶ 53-55. In preparation for her 8 April 2021 trial, Ussery's attorney requested that defendant Freeman provide copies of police body camera footage from Ussery's arrest as well as any other potentially exculpatory evidence. Ussery's counsel was not provided with video evidence of Ussery's arrest, despite Freeman's knowledge of the video and the nature of the evidence. SAC ¶ 57. Ussery alleges that this failure amounted to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id*. Ussery's counsel also subpoenaed Governor Cooper and his general counsel so that they could testify as to the meaning of EO 121.[2] SAC ¶ 58.

On 31 March 2021, allegedly in retaliation for her viewpoints and defense against her criminal charge, defendants Proctor and Hawley filed a complaint for criminal summons against Ussery for second degree trespass, alleging that, on 14 April 2020, Ussery had remained on premises of the State of North Carolina at 100 East Jones Street in Raleigh after having been notified not to enter or remain there by Raleigh Police Captain Barnes. SAC ¶ 59; [DE 50-8]. On 4 June 2021, Ussery was tried in Wake County District Court for violating EO 121 and for second degree criminal trespass. She was found by the judge to be guilty of both charges and fined $300 plus court costs. Ussery appealed to Wake County Superior Court for a *de novo* trial. SAC ¶ 62.

Ussery's counsel again sought discovery and received video footage of Ussery's custodial pat down and search prior to transport to the Wake County Detention Center and a brief video of Ussery's arrival at the Wake County Detention Center. The footage recorded by the SCP during Ussery's transport was not provided. SAC ¶ 63. After attempts by Ussery's counsel to gain access

---

[2] The Attorney General of North Carolina moved to quash the subpoenas. Defense counsel and the District Attorney's Office then stipulated that counsel's letter to Governor Cooper and Governor Cooper's response regarding the impact of EO 121 on protesting would be admitted without objection, and the governor and his general counsel were released from their subpoenas. SAC ¶ 60.

to the transport video footage failed, counsel filed a petition for release of custodial law enforcement agency recording pursuant to N.C. Gen. Stat. § 132.1.4A(f). The petition was granted and RPD and SCP were ordered to release the video footage. SAC ¶ 67.

After receiving agency recordings from both the RPD and the SCP, Ussery's counsel informed the assistant district attorney that there was additional SCP body camera footage and that the failure to produce such evidence violated *Brady v. Maryland*. SAC ¶ 67. On 23 November 2022, Ussery moved to dismiss the criminal charges based on multiple constitutional violations. SAC ¶ 70. On 2 December 2022, the Wake County District Attorney's Office offered Ussery an informal deferral with dismissal and expungement on completion of twenty-five hours of community service. SAC ¶ 71. On 20 February 2023, Ussery completed the deferral condition and the criminal charges were dismissed. SAC ¶ 72.

On 17 April 2023, the RPD filed a motion to show cause in state court relating to the release of police body camera footage by a third party on Twitter, which was in violation of the order to RPD and SCP to release the video footage in Ussery's case. SAC ¶ 73; [DE 50-10]. Ussery denied any involvement in the dissemination of the body camera footage. *Id.* Following a hearing, the state court found Ussery not to be in contempt of court and denied RPD's motion. SAC ¶ 74; [DE 50-11].

Ussery alleges that, as a result of her conviction, appeal, and defense of the show cause motion, she has missed work, had to travel from her home to Raleigh, amassed legal bills, suffered embarrassment as well as physical and emotional distress, and that the prolonged legal process caused a significant strain on and ultimately the end of her marriage. SAC ¶ 75.

## DISCUSSION

A. Legal standards

8

As noted above, the defendants have moved to dismiss the second amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a claim for lack of subject matter jurisdiction. "Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (citation omitted). When subject-matter jurisdiction is challenged, the plaintiff has the burden of proving jurisdiction to survive the motion. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647–50 (4th Cir. 1999).

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the facts alleged must allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009). A court "need not accept the plaintiff's legal conclusions drawn from the facts, nor need it accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (internal alteration, quotation, and citation omitted). A court may consider the materials attached to the complaint as well as those integral to the complaint without needing to convert the motion to one for summary judgment. *See* Fed. R. Civ. P. 10(c); *Am. Chiropractic Assoc. v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004); *Philips*, 572 F.3d at 180.

B. State law claims

At the outset, Ussery has agreed to dismissal without prejudice of Count VI as more appropriately brought in state court. [DE 61 p. 12; DE 62 p. 11]. In Count I, plaintiff alleges a conspiracy to deprive her of her constitutional rights by all defendants. SAC ¶¶ 76-112. She

9

specifically cites Article I, sections 12, 14, and 19 of the North Carolina Constitution in support of her conspiracy claim. SAC ¶ 77. Because, as discussed below, dismissal of plaintiff's federal claims is appropriate, the Court will decline to exercise jurisdiction over Count I insofar as it is premised on violations of the North Carolina Constitution. *See* 28 U.S.C. § 1367(c); *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995).

### C. Federal claims

The Court considers next Ussery's claims for violation of her rights under the United States Constitution pursuant to 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). "The essential elements of any [§] 1983 action are proof of conduct 'committed by a person acting under color of state law' that 'deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Avery v. Burke Cnty.*, 660 F.2d 111, 115 (4th Cir. 1981) (citation omitted). Additionally, the "doctrine of *respondeat superior* has no application under this section." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (citation omitted). Rather, a plaintiff must affirmatively show that "the official charged acted personally in the deprivation of the plaintiff's rights." *Id.*

Ussery has clarified in her responses to the motions to dismiss that her federal claims against the individual defendants have been brought against them in their individual, not official capacities. Accordingly, the Court need not consider the Eleventh Amendment and sovereign immunity arguments raised by defendants Freeman, Hooks, Hawley, Brock, Proctor, and Fink. *See* [DE 61 p. 12; DE 62 p. 11].

(1) *Mootness*

10

Ussery challenges EO 121 and the City of Raleigh's policy as facially unconstitutional because they violated First Amendment and Fourteenth Amendment due process rights. SAC ¶¶ 116, 130, 182. In her prayer for relief, Ussery seeks a declaration that defendants violated *her* First and Fourteenth Amendment rights. She does not expressly seek a declaration that EO 121 or the City's policy were facially unconstitutional. Ussery further does not seek injunctive relief.

Article III of the United States Constitution limits federal court jurisdiction to actual cases and controversies and requires that a dispute remain live. *U.S. Parole Comm' n v. Geraghty*, 445 U.S. 388, 395-96 (1980). "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* at 397 (quotation and citation omitted). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). A federal court lacks subject matter jurisdiction to decide a case which is moot due to Article III's case or controversy requirement. *Com. of Va. ex rel. Coleman v. Califano*, 631 F.2d 324, 326 (4th Cir. 1980).

EO 121 and the City's alleged policy are no longer in effect. *See* SAC ¶ 121. Defendant Freeman argues that this renders Ussery's facial challenges in Counts II and III moot. The Court agrees that any claim for declaratory or injunctive relief based upon a facial challenge is moot due to the expiration of the executive order and policy. *See, e.g., Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (holding, in case involving a preliminary injunction, "that a case challenging a statute, executive order, or local ordinance usually becomes moot if the challenged law has expired or been repealed [because] [o]nce the law is off the books, there is nothing injuring the plaintiff and, consequently, nothing for the court to do."); *Reyes v. City of Lynchburg*, 300 F.3d 449, 453 (4th Cir. 2002); *Murray v. Bd. of Trustees, Univ. of Louisville*, 659 F.2d 77, 78-79 (6th Cir. 1981);

11

*Glob. Impact Ministries v. Mecklenburg Cnty.*, No. 3:20-CV-00232-GCM, 2022 WL 610183, at *5 (W.D.N.C. Mar. 1, 2022). However, Ussery also brings as-applied challenges and seeks nominal damages, which are not mooted by the expiration of EO 121 and end of the City's policy. *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 550 (4th Cir. 2010) (citing *Covenant Media of SC v. City of N. Charleston*, 493 F.3d 421, 429 n.4 (4th Cir. 2007)); *see also Uzuegbunam v. Preczewski*, 592 U.S. 279, 141 S.Ct. 792, 802 (2021) ("request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right."). Accordingly, the Court lacks subject matter jurisdiction to consider Ussery's facial challenges but will consider her as-applied challenges to EO 121 and the City pf Raleigh's policy.

(2) *Absolute prosecutorial immunity*[3]

Ussery alleges that defendant Freeman advised law enforcement regarding ReOpenNC's 14 April 2020 protest and was authorized under state law to prosecute Ussery. SAC ¶ 13.

Defendant Freeman argues that absolute prosecutorial immunity bars plaintiff's individual capacity claims against her, and that, to the extent she is not protected by prosecutorial immunity, she is entitled to qualified immunity. Absolute prosecutorial immunity protects district attorney defendants from liability for those activities which are traditionally associated with prosecution of a case, *Nivens v. Gilchrist*, 444 F.3d 237, 249 (4th Cir. 2006), and it "safeguards the process, not the person[.]" *Nero v. Mosby*, 890 F.3d 106, 117 (4th Cir. 2018). "[I]n initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under [§] 1983." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976); *see also State ex rel. Jacobs v. Sherard*, 36 N.C. App. 60, 65 (1978). But absolute immunity does not extend to activities outside the scope of

---

[3]Prosecutorial immunity is considered at the motion to dismiss stage under the Rule 12(b)(6) standard, and the Court thus treats the properly alleged facts as true. *Tigano v. United States*, 527 F. Supp. 3d 232, 243 n.4 (E.D.N.Y. 2021).

Case 5:23-cv-00219-BO-RJ   Document 69   Filed 06/20/24   Page 12 of 31

traditional prosecutorial functions, such as administrative and investigatory actions. *Buckley v.*

*Fitzsimmons*, 509 U.S. 259, 273 (1993).

> A prosecutor acts as an advocate when she professionally evaluates evidence assembled by the police, decides to seek an arrest warrant, prepares and files charging documents, participates in a probable cause hearing, and presents evidence at trial. In contrast, a prosecutor does not act as an advocate, but rather in an investigative or administrative capacity, when she gives legal advice to police during an investigation, investigates a case before a probable cause determination, and personally attests to the truth of averments in a statement of probable cause.

*Nero*, 890 F.3d at 118 (internal citations omitted).

Ussery appears to agree that defendant Freeman enjoys absolute prosecutorial immunity "relating to her decision to charge and prosecute Plaintiff," [DE 61 p. 14], thus disposing of Count V. Count IV is alleged only against defendant Freeman and relates specifically to an alleged *Brady* violation. "It is well established . . . that the failure to disclose exculpatory evidence while a criminal proceeding is pending is an 'advocative' function protected by absolute immunity." *Annappareddy v. Pascale*, 996 F.3d 120, 141 (4th Cir. 2021). Ussery does not dispute this, but contends that, in this case, defendant Freeman ought not to be shielded. Ussery, however, provides no persuasive grounds for declining to grant absolute immunity for any alleged *Brady* violation by defendant Freeman in light of the well-established authority.

Ussery contends that Freeman is not protected by absolute immunity for failing provide to Ussery body camera footage in direct violation of a court's order to do so. *See Munchinski v. Solomon*, 747 F. App'x 52, 58 (3d Cir. 2018) ("The more discretion a judicial order eliminates from the prosecutor's role, the more likely it is that a violation of that order strips the prosecutor of absolute immunity."). But, as Ussery has alleged, the state court order directing disclosure of the body camera footage was directed to the relevant law enforcement agencies, not defendant Freeman or her office. *See* SAC ¶ 67; [DE 50-10, p. 5]. No discretion was eliminated from

13

Freeman's role by entry of that order, and thus Ussery's argument fails. Freeman is entitled to absolute prosecutorial immunity for Counts IV and V of the second amended complaint.

Ussery argues that her First Amendment claim in Count II includes a claim for selective enforcement of EO 121 for which Freeman is not entitled to absolute immunity. First, a prosecutor "is absolutely immune regardless of [her] motivation" for the decision to file charges. *Nero*, 890 F.3d at 119.[4] Moreover, *Frederick Douglass Foundation v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023), on which Ussery relies, does not support Ussery's argument. There, the plaintiff sued the District of Columbia alleging that the District's selective enforcement of its defacement ordinance amounted to viewpoint discrimination in violation of the First Amendment. *Id.* at 1135. "Selective enforcement claims require courts to separate unlawful discrimination from the ordinary and lawful exercise of prosecutorial discretion. Because the executive cannot address every violation of the laws, the prosecution (and non-prosecution) power is a vital aspect of the executive power." *Id.* at 1136. The court in *Fredrick Douglass Foundation* did not, however, consider whether absolute immunity would bar a claim for selective prosecution against a prosecutor, and it is thus inapposite to the Court's consideration of Freeman's absolute immunity. The Court determines that Freeman is entitled to absolute immunity for Ussery's selective enforcement portion of her First Amendment claim in Count II.

(3) *Qualified immunity*[5]

---

[4] *But see United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification[.]") (internal quotation and citation omitted).

[5] Qualified immunity is also considered at the motion to dismiss stage under the Rule 12(b)(6) standard. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

Each of the individual defendants has argued that they are entitled to qualified immunity

for Ussery's § 1983 claims.

> The doctrine of qualified immunity shields government officials from liability for
> civil damages when their conduct does not violate clearly established constitutional
> or other rights that a reasonable officer would have known. *Pearson v. Callahan*,
> 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *Graham v. Gagnon*,
> 831 F.3d 176, 182 (4th Cir. 2016). Qualified immunity seeks to balance two
> interests, namely, the "need to hold public officials accountable when they exercise
> power irresponsibly and the need to shield officials from harassment, distraction,
> and liability when they perform their duties reasonably." *Graham*, 831 F.3d at 182
> (quoting *Pearson*, 555 U.S. at 231, 129 S.Ct. 808). To avoid dismissal of a
> complaint after a qualified immunity defense is raised, a plaintiff must allege
> sufficient facts to set forth a violation of a constitutional right, and the court must
> conclude that this right was clearly established at the time of the alleged violation.
> *Pearson*, 555 U.S. at 232, 129 S.Ct. 808.

*Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018). A court has discretion in deciding which

prong of the qualified immunity analysis – whether there was a violation of a constitutional right

or whether the right was clearly established – to consider first. *Pearson*, 555 U.S. at 236. "The

protection of qualified immunity applies regardless of whether the government official's error is

'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.*

at 231 (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

The Court begins its analysis with determining whether the rights alleged by Ussery to

have been violated were clearly established. "Clearly established means that, at the time of the

officer's conduct, the law was sufficiently clear that every reasonable official would understand

that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal

quotations and citation omitted). In making this determination, the Court must identify the specific

rights the plaintiff alleges were violated at a high level of particularity. *Id.*; *Garrett v. Clarke*, 74

F.4th 579, 584 (4th Cir. 2023).

Ussery contends that her First Amendment rights were violated when she was arrested for

protesting EO 121 and the "lockdown" policies while standing alone in a state government parking

15

lot and that EO 121 was unconstitutionally void for vagueness. She further contends that her First Amendment, equal protection, and due process rights were violated when defendants selectively enforced EO 121, treated her differently from other protestors, and retaliated against her for engaging in protest that was disfavored by defendants.

It is axiomatic that "[a] bedrock First Amendment principle is that citizens have a right to voice dissent from government policies." *Tobey v. Jones*, 706 F.3d 379, 391 (4th Cir. 2013). The First Amendment also protects individuals from retaliation for exercising that right. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). Selective enforcement of the law can violate the Equal Protection Clause, *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 634 (4th Cir. 2016), and "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

However, when deciding whether qualified immunity applies, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017). "And the particulars matter. A reasonable officer will be unable to 'determine how the relevant legal doctrine will apply to the factual situation' if the circumstances differ too much from prior cases." *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 683 (4th Cir. 2023) (alteration and citation omitted).

EO 121, the Wake County Proclamation, and the alleged policy of the City of Raleigh that protesting is not an essential activity all arose during the early weeks of a global pandemic which, as Ussery has alleged, "turn[ed] the world upside down." SAC ¶ 4. Ussery was arrested and prosecuted for violating the restrictions on mass gatherings outlined in EO 121 and subsequently charged with second degree trespass. *See* [DE 50-3; 50-8]. She alleges, for example, that EO 121 and the City of Raleigh's policy violated her First Amendment right to free speech. SAC ¶ 130.

16

She further alleges that defendants retaliated against her for engaging in peaceful protest and publicly dissenting from the governor's policies and executive order, in violation of the First Amendment. SAC ¶ 131. In opposition to the motions to dismiss, Ussery also defines the rights violated at a low level of particularity, citing, generally, bedrock and fundamental First Amendment, due process, and equal protection principles. But none of the cases on which Ussery relies, *see, e.g., Occupy Columbia v. Haley*, 738 F.3d 107 (4th Cir. 2013); *Tobey*, 706 F.3d 379; *Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001), include circumstances that resemble those present in this case: a newly effective executive order and proclamation placing limits on mass gatherings in order to slow the spread of a global pandemic. For this reason, "courts across the country have addressed qualified immunity for government officials at the 12(b)(6) stage regarding Covid-19 measures and found government officials to be immune from suit in their personal capacities." *Pleasant View Baptist Church v. Beshear*, No. 220CV00166GFVTCJS, 2021 WL 4496386, at *8 (E.D. Ky. Sept. 30, 2021) (listing cases), *aff'd,* 78 F.4th 286 (6th Cir. 2023); *see also Bellatoni v. Lamont*, 671 F. Supp. 3d 140, 146 (D. Conn. 2023); *New Mexico Elks Ass'n v. Grisham*, 595 F. Supp. 3d 1018, 1028 (D.N.M. 2022) (listing cases holding same); *Stewart v. Justice*, 518 F. Supp. 3d 911, 921 (S.D.W.Va. 2021) (no precedent that reliance on executive order unreasonable when effecting arrest for violating COVID-19 mask mandate).

This Court has been presented with no controlling case or consensus of non-controlling authority which would support a determination that *every* reasonable officer or state official would understand that enforcing EO 121, the Wake County Proclamation, or the City's alleged policy as against Ussery after the world had been turned upside down by a highly transmissible virus would violate her constitutional rights. To the contrary,

> [o]ur Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States to guard and protect. When those

17

> officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad.

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (internal alterations, quotation marks, and citations omitted) (quoting first *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905); then *Marshall v. United States*, 414 U.S. 417, 427 (1974)). To that end, qualified immunity is afforded for state officials in those "gray areas, where the law is unsettled or murky[,]" even where their actions are later determined to be wrongful. *Rogers v. Pendleton*, 249 F.3d 279, 286 (4th Cir. 2001). At bottom, when defined at the proper level of specificity, the rights Ussery has alleged were violated were not clearly established. Accordingly, the Court determines that qualified immunity shields the individual defendants from suit for plaintiff's § 1983 claims alleged against them in their individual capacities.

To the extent any right Ussery claims to have been violated was clearly established, Ussery has also failed, as is discussed more fully below, to plausibly allege that any of the individual defendants violated her constitutional rights. The individual defendants would therefore be entitled to qualified immunity on this ground as well.

(4) *Failure to state a claim*

At the outset, the Court notes that, with the exception of Count IV, the claims in the second amended complaint are each alleged against all of the defendants, generally. While perhaps not specifically prohibited, such method of pleading nonetheless "impacts the Court's plausibility analysis," *All. Tech. Grp., LLC v. Achieve 1, LLC*, Civil Action No. 3:12CV701-HEH, 2013 U.S. Dist. LEXIS 4708, at *12 (E.D. Va. Jan. 11, 2013), specifically in determining whether Ussery has alleged "sufficient facts to allow the court to infer liability as to *each* defendant." *Langford v. Joyner*, 62 F.4th 122, 126 (4th Cir. 2023). This is particularly problematic in the context of claims

18

arising under § 1983, for which a plaintiff must plausibly allege that each individual defendant acted personally in violating a constitutional right.

(a) § 1983 conspiracy

A plaintiff bears a "weighty burden" to establish a conspiracy under § 1983. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). The plaintiff must show that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right . . .." *Id.* The plaintiff must "plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 434 (4th Cir. 2020) (citations omitted). The allegations must "reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Hinkle*, 81 F.3d at 421.

Ussery alleges that in August 2022 she "discovered that Defendants had agreed to much more than simply stopping a protest and arresting her for being present. From RFP police body camera recordings, Plaintiff discovered that [EO 121] and the public health were a pretext to Defendants Freeman, Bond, Hawley, Brock, and upon information and belief, Defendant Secretary Hooks to suppress the critical speech of Plaintiff and others gathered at the [14 April 2020] protest . . ., and to prevent other protests by ReOpenNC planned for each week until the lockdown was lifted." SAC ¶ 83. A conference call allegedly took place, with defendants Freeman, Brooks,[6] Hawley, the Secretary of State,[7] and Bond participating, wherein an agreement was reached as to

---

[6] There is no defendant with the surname Brooks.
[7] Ussery contends that Bond likely was referring to Secretary of the Department of Public Safety Hooks.

19

how to proceed regarding the 14 April 2020 protest. SAC ¶ 85. During the call, Bond allegedly stated that he hoped once agitators were arrested the remaining protestors would disperse, that he wanted to start "locking up people as soon as possible," and that he had had a discussion with defendant Freeman and that she was "cool" with the plan. *Id.*; SAC ¶ 86. Finally, Bond allegedly stated that he wanted to get it right with this first protest so that hopefully they would not have to deal with another protest the following week. SAC ¶ 85.

While Ussery's allegations plausibly support that there was an agreement, at least between defendants Bond and Freeman, as to how to enforce EO 121 during a planned protest, Ussery has failed to plausibly allege that there was any mutual understanding to accomplish *an unlawful plan*, or, in other words, to violate her or any other ReOpenNC protestor's constitutional rights. Additionally, plaintiff alleges only that Secretary Hooks and Chief of the North Carolina General Assembly Police Brock participated in the conference call, but there are no allegations which would plausibly support a finding that they engaged in *any* acts in furtherance of any alleged conspiracy.

In sum, Ussery has failed to state a plausible § 1983 conspiracy claim because, at bottom, she alleges parallel conduct along with a bare assertion of a conspiracy.

(b) First Amendment

In Count II, Ussery alleges that defendants violated her First Amendment rights to free expression, free association, and assembly. SAC ¶ 114. Ussery alleges that application of EO 121 and the Wake County Proclamation[8] against her violated the Free Speech Clause of the First Amendment by punishing and suppressing speech based upon a content and viewpoint-based

_____

[8] Though Ussery identifies Wake County's Proclamation in her SAC and makes passing reference to it throughout her allegations, she does not appear to allege or argue that it directly violated any of her rights or that it was enforced as against her. The Court determines that Ussery has failed to state any plausible claim for relief as to the Wake County Proclamation.

20

restriction. Ussery alleges that she was retaliated against by defendants for engaging in protected First Amendment activities. SAC ¶131. Plaintiff challenges EO 121 and the City of Raleigh's policy as violating her First Amendment rights.

In a public forum,[9] "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citation omitted).

EO 121 makes no reference to the content of any speech it may restrict and rather was targeted at limiting the size of gatherings. In determining whether a restriction is content-neutral, the "principal inquiry" is whether the restriction on speech has been imposed "because of disagreement with the message [the speech] conveys." *Ward*, 491 U.S. at 791. Here, as in *Ramsek v. Beshear*, 468 F. Supp. 3d 904, 916 (E.D. Ky. 2020), on which Ussery relies, ReOpenNC's protest was planned *in response* to the governor's stay-at-home order and restriction on mass gatherings, and thus EO 121 cannot be said to have been imposed *because* of any disagreement with speech it restricted.

"A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. EO 121 restricted the manner in which North Carolinians could engage in First Amendment protected activities by limiting the size of gatherings, and its impact on protected First

---

[9] The Court assumes, without deciding, that this case concerns a traditional public forum. *See White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 (4th Cir. 2022) (discussing different types of forums and associated level of First Amendment protection).

21

Amendment activities was incidental as the purposes served by limiting the size of gatherings were unrelated to the content of any expression.

Ussery's allegations recognize that EO 121 was issued in response to an emerging global pandemic. SAC ¶¶ 25-28. The protection of North Carolinians from a growing public health emergency was, and is, a significant governmental interest. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (applying strict scrutiny to non-neutral COVID restriction and finding that "[s]temming the spread of COVID-19 is unquestionably a compelling interest"); *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020). And, importantly, March and April 2020 were

> scarcely a month into the COVID-19 pandemic and our understanding of the virus's spread. State and local officials were working to slow the transmission of the virus, to "flatten the curve," to protect public health, and to limit the severe demands that COVID-19 cases were placing on the health-care system. Placing limits on public gatherings within the state was tailored to "prevent[ ] the transmission of viral particles ... from one person to the next." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 761 (7th Cir. 2020). With the benefit of hindsight and additional scientific evidence, [it can be] assume[d] that reasonable minds might disagree on whether any particular restrictions among those early responses were the most effective means of stopping the spread of COVID-19. But [the] analysis is focused on what state and local officials knew at the time.

*Navratil v. City of Racine*, 101 F.4th 511, 520 (7th Cir. 2024) (quoted alterations in original).

"[A] regulation satisfies the narrow-tailoring requirement if it does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 717 (4th Cir. 2018) (citation omitted). EO 121 was narrowly tailored, as it did not prohibit all mass gatherings, but rather imposed size limits and distancing requirements. Finally, plaintiff has not plausibly alleged that EO 121 impermissibly failed to leave open other avenues for communication.

22

In sum, the Court concludes that Ussery has failed to plausibly allege that EO 121 violated her First Amendment rights. Ussery's arrest and prosecution for violating EO 121 was therefore not in retaliation for the exercise of any First Amendment rights. *See Navratil*, 101 F.4th at 520 (where attendance at rally was in violation of COVID-19 stay-at-home order, which was found to be a reasonable restriction on speech, attendance was not protected speech and plaintiff could not establish a retaliation claim).

The existence of the magistrate's probable cause finding as well as her conviction in the district court further defeat Ussery's claim that she was arrested and prosecuted in retaliation for exercising her First Amendment rights. *Pegg v. Herrnberger*, 845 F.3d 112, 119 (4th Cir. 2017). Although Ussery has alleged that her arrest was not supported by probable cause, she has also alleged that she was subsequently convicted and has attached the magistrate's probable cause finding to her complaint. *Cf. Tobey*, 706 F.3d at 392 (plaintiff's allegations that he engaged in peaceful protest at airport, that arrest was not supported by probable cause, and that charges dismissed sufficient to state a First Amendment retaliation claim).

Ussery's reliance in her opposition to the motions to dismiss on *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018), and *Nieves v. Bartlett*, 587 U.S. 391 (2019), is inapposite. *Lozman* addressed allegations that "high-level city policymakers adopted a plan to retaliate against [Lozman] for protected speech and then ordered his arrest when he attempted to make remarks during the public-comment portion of a city council meeting." 585 U.S. at 90-91. Ussery has not alleged any city policy or plan to retaliate against *her* specifically for any past conduct. *Nieves* recognized that "[a]lthough probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U.S. at 406. Ussery's arrest for

23

violating EO 121's restrictions on mass gatherings occurred shortly after its implementation and during a rapidly evolving state and local response to a global pandemic. Her allegations regarding other protests in Raleigh are insufficient to plausibly support that any law enforcement defendants "typically exercise[d] their discretion" not to arrest other protestors in similar circumstances. *Id.*

Ussery also argues that she has plausibly alleged a First Amendment selective enforcement claim. First Amendment "[s]elective enforcement claims are cabined by the requirement that a plaintiff demonstrate he is similarly situated to others against whom the law was not enforced." *Frederick Douglass Found.*, 82 F.4th at 1145. Liability is also limited to cases in which an unconstitutional practice or policy has been identified. *Id.* But Ussery has alleged that other protesters with her viewpoint were *not* arrested or prohibited from protesting the restrictions in EO 121. Ussery has also alleged that other protesters not expressing her viewpoint were arrested, like her, for misdemeanor crimes. Thus, the Court determines that she has failed to plausibly allege a First Amendment selective enforcement claim.

(c) Fourteenth Amendment due process

In her procedural due process claim alleged against all defendants, generally, Ussery alleges that EO 121 was unconstitutionally vague such that defendants interpreted and applied it in such a way that violated her Fourteenth Amendment right to due process. Ussery alleges that the mass gathering section of EO 121 specifically was unconstitutionally vague, lacked clarity, and encouraged arbitrary enforcement depending on what was being protested and who was protesting.

"To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d

24

264, 272 (4th Cir. 2019) (en banc). A statute need not "include the most elaborate or the most specific definitions possible" to withstand a void for vagueness challenge. *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012).

A review of EO 121's mass gathering provision demonstrates that it provided ample notice of what conduct was prohibited. EO 121 defined mass gatherings as any event which brought together more than ten persons at the same time in a confined indoor or outdoor space. It further expressly left in effect EO 117, which had prohibited mass gatherings of more than 100 people, SAC ¶ 25, but with the new definition of mass gatherings provided in EO 121. In other words, EO 121 prohibited mass gatherings, defined as ten or more persons in confined indoor and outdoor spaces. EO 121 further provided that when using public outdoor spaces, persons must, as much as reasonably possible, maintain a distance of six feet from other persons, with the exception of family or household members. EO 121 § 1, ¶ 1. EO 121 also defined social distancing requirements and permitted individuals to engage in outdoor activity so long as they complied with social distancing and mass gatherings limitations. *Id*. § 1 ¶ 3(iii).

Ussery does not meaningfully contest that the language of EO 121 is understandable by a person of ordinary intelligence, but contends that her claims of selective enforcement, viewpoint discrimination, and infringement of First Amendment rights demonstrate that EO 121 failed to include explicit standards which were sufficient to prevent arbitrary enforcement. The plain terms of EO 121 do not support Ussery's arguments. EO 121 expressly defined the terms "mass gathering" and "social distancing," explicitly provided that individuals could engage in outdoor activities so long as they complied with social distancing requirements and the mass gathering restriction, and provided what penalties could be imposed for violating the terms of the executive order. These definitions provided sufficient guidance to prevent discriminatory or arbitrary

25

enforcement. Ussery has failed to plausibly allege that EO 121 was void for vagueness. *See also Glob. Impact Ministries*, 2022 U.S. Dist. LEXIS 36021, at *25 (stay-at-home order issued during COVID-19 pandemic not void for vagueness); *Butler v. City of New York*, 559 F. Supp. 3d 253, 272 (S.D.N.Y. 2021) (definitions regarding mass gathering prohibition in emergency executive order provided sufficient guidance to law enforcement such that order was not void for vagueness).

(d) Fourteenth Amendment equal protection

Ussery alleges that defendants violated the Equal Protection Clause of the Fourteenth Amendment when they arrested and prosecuted her for violating EO 121 and state trespass laws when other protesters were not arrested or prosecuted. "Equal protection claims are allowed in [selective enforcement] circumstances not because the particular law at issue is facially invalid or inapplicable to the plaintiff's conduct, but because of the concern that individuals with discretion in law enforcement will take advantage of that discretion to oppress unpopular groups." *Abcarian v. McDonald*, 617 F.3d 931, 940 (7th Cir. 2010). Unlike a First Amendment selective enforcement claim, a claim for selective enforcement under the Equal Protection Clause requires a plaintiff to plausibly allege discriminatory animus. *See Frederick Douglass Found.*, 82 F.4th at 1144-45.

In opposition to dismissal of this claim, Ussery primarily argues that she has alleged a First Amendment selective enforcement claim and that she has plausibly alleged an equal protection claim under *Frederick Douglass Foundation*. In *Frederick Douglass Foundation*, as here, however, the plaintiff had pleaded facts that were only, at best, consistent with invidious discrimination by any defendant in enforcing EO 121 against plaintiff, rather than facts which would support an inference that any defendants were "motivated by the desire to suppress some views and raise up others." 82 F.4th at 1147. Ussery relies on her allegations that ReOpenNC protesters expressed views with which defendants were "displeased," SAC ¶ 170, and that other

protests, including a ReOpenNC protest, occurred without arrests while the same limits on mass gatherings were in place. *See, e.g.,* SAC ¶¶ 172-173. Thus, according to Ussery's own allegations, others expressing her same viewpoint were not arrested under similar circumstances. She has failed, therefore, to plausibly allege that any defendants used EO 121 to oppress an unpopular group. Ussery's equal protection claim is therefore properly dismissed.

      (e) City of Raleigh *Monell* claim

      Ussery alleges that the City of Raleigh violated her First Amendment rights to freedom of speech and freedom of assembly as well as her Fourteenth Amendment due process and equal protection rights. "When a § 1983 claim is asserted against a municipality, two issues must be determined: '(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.'" *Covenant Media*, 493 F.3d at 436 (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 120 (1992)); *see also Monell v Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978).

      Municipal liability only results "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. "'Policy' in this context implies most obviously and narrowly a 'course of action consciously chosen from among various alternatives' respecting basic governmental functions, as opposed to episodic exercises of discretion in the operational details of government." *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987) (citation omitted). A policy or custom for which a municipality may be held liable may be (1) an express policy, such as a written ordinance or regulation; (2) the decisions of a person with final policymaking authority; (3) an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) a practice that is so persistent and widespread

27

as to constitute a custom or usage with the force of law. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

First, as discussed above, Ussery has failed to plausibly allege that any of the individual defendants violated her constitutional rights. She has therefore failed to plausibly allege the first prong of a *Monell* claim.

Ussery has also failed to plausibly allege the existence of a policy which caused any alleged harm. Ussery appears to proceed under the second theory of liability, that the challenged policy was the decision of a person with final policymaking authority. Ussery has identified defendant Deck-Brown as having final policymaking authority for policing decisions in the City of Raleigh. Ussery alleges that "[a]s Chief of Police for the City of Raleigh, Defendant Deck-Brown either was responsible for creating or approved of the tweets published from Raleigh Police's Twitter account" and that defendant Deck-Brown had the actual or delegated policymaking authority for policing in the City of Raleigh. SAC ¶¶ 39, 14.

The policy relied upon by Ussery is evidenced by a post by RPD on Twitter that protesting is a non-essential activity. SAC ¶¶ 37, 88, 124. First, Ussery's allegation that the RPD post on Twitter represents the decision of a policymaking official for the City of Raleigh is threadbare. Plaintiff alleges without support that defendant Deck-Brown was either responsible for creating or approving the post to Twitter by RPD. SAC ¶ 39.

Ussery argues in opposition to the City's motion to dismiss that her allegation that Bond was the commander of the enforcement activities at the State Government Complex on 14 April 2020 is sufficient to allege that he is a final policymaker for the City, but she has cited no case or North Carolina law which would support such an allegation. *See Hunter v. Town of Mocksville*, 897 F.3d 538, 555 (4th Cir. 2018) (whether a person is a final policymaker is a question of state

28

law); *Somers v. Devine*, No. 23-0102-BAH, 2024 U.S. Dist. LEXIS 80857, at *20-21 (D. Md. May 3, 2024) (noting that city managers, sheriffs, and police chiefs, but not police officers, have been found to be final policymakers). While Ussery has alleged the details of a conference call conducted by RPD Captain Bond, *Monell* liability is inapplicable where the allegations would support only the employment of an alleged tortfeasor, *Hunter*, 897 F.3d at 553, and her allegations that Bond had policymaking authority or was authorized to implement the City's policy are conclusory.

Even if Ussery has plausibly alleged the existence of a policy as reflected by the decision of a person with policymaking authority for the City, she must also plausibly allege that it violated her First and Fourteenth Amendment rights. *Sharpe*, 59 F.4th at 680. RPD's use of the term "non-essential" in its post to Twitter plainly arises from the language of EO 121 itself. EO 121 ordered all persons in North Carolina to stay at home unless engaged in essential activities, essential governmental operations, or essential businesses and operations. [DE 50-1] (EO 121 § 1 ¶ 1). "Essential activities" are defined by EO 121 § 1, ¶ 3, and the definition does not include engaging in public protest or the exercise of any other First Amendment right. EO 121 requires enforcement of its provisions by state and local law enforcement and states that violation of its provisions would be subject to prosecution and punishable as a Class 2 misdemeanor. *Id.* § 6.

"Although [a municipality] can be liable for enforcing a state regulation it has voluntarily adopted as its own, it cannot be held liable for state statutes it has not consciously adopted into its own policy." *Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cnty.*, 854 F. App'x 521, 532 (4th Cir. 2021) (citing with approval *Vives v. City of New York*, 524 F.3d 346, 351 (2d Cir. 2008)). Here, EO 121 mandated enforcement by RPD and other law enforcement agencies. Accordingly, Ussery has not plausibly alleged that the City of Raleigh's enforcement of EO 121

29

was as a result of any City of Raleigh policy rather than its mandate to enforce the terms of EO 121.

In response to the City's motion to dismiss, Ussery contends that the precise contours of the policy which led to her arrest are not known at this time. But, even at this stage, Ussery must come forward with "more than [] unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678. Ussery argues that, unlike the City's policy, EO 21 did not prohibit public protesting, but rather limited the size of mass gatherings, and she was not in violation of the mass gathering limitation when she was arrested. [DE 63 p. 16]. But, contrary to plaintiff's argument, Ussery was not arrested or prosecuted for engaging in a protest. She was arrested and prosecuted for violating EO 121, which the RPD was mandated to enforce. At bottom, Ussery has failed to plausibly allege that the City of Raleigh itself is responsible for any alleged violation of her constitutional rights.

In sum, Ussery's facial challenges to EO 121 and the City's of Raleigh's alleged policy are moot. The individual defendants are shielded from liability in their individual capacities for Ussery's § 1983 claims under either absolute prosecutorial or qualified immunity. Ussery has otherwise failed to state a § 1983 claim or plausibly allege a claim against the City of Raleigh under *Monell*. The Court will therefore dismiss each of Ussery's § 1983 claims.

CONCLUSION

Accordingly, for the foregoing reasons, the motions to dismiss [DE 53, 55, 57, 59] are GRANTED. Count VI is DISMISSED WITHOUT PREJUDICE and the Court declines to exercise supplemental jurisdiction over the state law portions of Count I. The remaining counts in the second amended complaint are DISMISSED. The motion for leave to file excess pages [DE 68] is GRANTED. The clerk is directed to close the case.

30

SO ORDERED, this 18 day of June 2024.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE